**A.C. FINANCIAL, INC., a Utah corporation, Plaintiff and Appellant,**

v.

**SALT LAKE COUNTY, Defendant and Appellee.**

**Utah Association of Counties, Utah Bankers Association, Utah Land Title Association, and Utah State Tax Commission, Amici Curiae.**

No. 960136.

Supreme Court of Utah.

Nov. 14, 1997.

Chris L. Schmutz, Salt Lake City, for A.C. Financial.

Mary Ellen Sloan, Douglas R. Short, Bill Thomas Peters, Salt Lake City, for Salt Lake County.

Gary O. McKean, Farmington, for Utah Association of Counties.

Don B. Allen, Salt Lake City, for Utah Bankers Association.

Bruce A. Maak, Salt Lake City, for Utah Land Title Association.

Jan Graham, Att'y Gen., John C. McCarrey, Asst. Att'y Gen., Salt Lake City, for State Tax Commission.

STEWART, Associate Chief Justice:

## INTRODUCTION

A.C. Financial, Inc., appeals from a summary judgment entered against it and in favor of Salt Lake County in A.C. Financial's quiet title action regarding two parcels of its land against which the County asserts liens for personal and real property taxes. A.C. Financial contests the trial court's rulings that (1) the County established liens for personal property taxes on these parcels, and (2) these liens and liens for real property taxes on the same parcels were entitled to priority over A.C. Financial's trust deed.

## BACKGROUND

On May 13, 1987, W.W. & W.B. Gardner ("Gardner"), an engineering and construction company, executed a trust deed to First Interstate Bank to secure a $500,000 promissory note. Beginning in 1988 and continuing until 1992, Gardner failed to pay taxes assessed by the County on Gardner's personal property and various parcels of real property.[1] In March 1988, an officer of Gardner wrote to the assessor's office, enclosing a description of a parcel of real property owned by Gardner and asking the assessor to "use this information to facilitate a deferral of our 1988 personal property tax assessment." The 1988 real property assessment made no mention of these personal property taxes; however, the 1989 real property assessment for one of Gardner's parcels (the

"008 parcel") listed amounts owed for personal property taxes for both 1988 and 1989. These personal property taxes made up a large portion of the 1989 tax bill—approximately $45,000 of $48,000. In March 1990, another Gardner officer informed the assessor's office that Gardner "would appreciate your assistance in attaching the AFFIDAVITS OF PERSONAL PROPERTY to our real estate taxes due in November of 1990."[2] The subsequent 1990 real property assessment for a second parcel (the "004 parcel") included approximately $15,000 for personal property taxes. Substantially smaller amounts of personal property taxes were included on real property tax notices for 1991 and 1992. In early March 1992, A.C. Financial purchased the trust deed and promissory note from First Interstate Bank.[3] Later that month, A.C. Financial recorded a notice of default and intent to sell the property, giving notice to other parties, including the County. In May 1992, Gardner filed for bankruptcy. In December of that year, A.C. Financial bought the property for $50,000 at the foreclosure sale.

Following the December foreclosure sale, A.C. Financial brought a quiet title action to challenge the validity of the tax liens appearing on the County's real property records. The County's answer sought judicial foreclosure of those liens. The County claims that as of June 1995, a total of $63,049 in real and personal property taxes, interest, and penalties was owed on the 004 parcel and $112,037.60 was owed on the 008 parcel. Following discovery, A.C. Financial moved and the County cross-moved for partial summary judgment on the issue of whether liens on the real property for the unpaid personal property taxes existed.[4] The court ruled

1. It appears from the record that Gardner also failed to pay personal property taxes owed for 1987, but the County has not claimed any liens for taxes in that year.

2. This letter was written on the day that the personal property taxes for 1990 were due to be paid to the County. Gardner submitted the personal property affidavit which constitutes the personal property tax notice on that day as well. Given that context, it is clear that Gardner's intent was that the real property attachment take

effect in lieu of Gardner's paying the personal property taxes.

3. A.C. Financial paid $32,500. At that time, approximately $52,000 remained owing on the original loan.

4. The record shows that there was some confusion as to the scope of the County's motion for summary judgment. After the court's ruling, the County asserted that the court had granted it summary judgment on *all* issues. The court later

that the County had valid liens. Subsequently, the County moved and A.C. Financial cross-moved for summary judgment as to whether the liens had priority over the trust deed under which A.C. Financial claims title. The County's summary judgment motion relied on liens for both personal and real property taxes, while A.C. Financial's motion was directed only to the priority of the personal property tax liens. Relying on *Union Central Life Insurance Co. v. Black*, 67 Utah 268, 278, 247 P. 486, 487 (1926), the court ruled that the liens should be accorded priority over the earlier created trust deed and were thus not eliminated by foreclosure of the trust deed. A.C. Financial appealed both rulings to this Court.

This appeal presents two primary questions: first, whether valid liens for personal property taxes ever attached to the real property and, second, whether liens on real property for personal and real property taxes are subject to a trust deed interest created before accrual of the taxes underlying the liens. When we review a summary judgment, we accord no deference to the trial court's conclusions that there were no disputed issues of material fact and that the County was entitled to judgment as a matter of law.

We turn first to the priority question, which, because A.C. Financial does not dispute the existence of liens for real property taxes, we must decide irrespective of whether liens for personal property taxes attached.[5] Both issues were resolved below on summary judgment in favor of the County. "Summary judgment is proper only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Draper City v. Estate of Bernardo,*

888 P.2d 1097, 1099 (Utah 1995). "In reviewing the trial court's grant of summary judgment, this court views the facts in the light most favorable to the nonmoving party." *Schnuphase v. Storehouse Markets,* 918 P.2d 476, 477 (Utah 1996). We therefore construe the facts in the light most favorable to A.C. Financial.

## I. TAX LIEN PRIORITY

A.C. Financial argues that special priority cannot be accorded the County's tax liens because nothing in Utah statutory or case law affirmatively establishes such a priority. A.C. Financial acknowledges that *Black,* 67 Utah at 278, 247 P. at 489, held that tax liens enjoy priority over previously created contractual liens but argues that *Black* has been implicitly overruled and should now be explicitly overruled as unwise policy. The County argues that *Black* ensures that the State can collect necessary operating revenues and that therefore *Black* should be reaffirmed.

The primary question for us to resolve with regard to the priority issue is whether *Black* continues to be valid authority. *Black* held that liens for unpaid personal property taxes that were attached to the taxpayer's real property as well as liens for real property taxes on the same property were not subject to a previously created mortgage interest in the real property; therefore, this case is on all fours with *Black.*[6] In framing the issue, the *Black* Court recognized as a general principle of law that the Legislature has power to make its tax liens prior to any other lien but that to do so, "such intent of the Legislature must be found in the language used, either expressly or by necessary

---

clarified the scope of this order as covering only the question of whether the County had a lien on the real property for unpaid personal property taxes.

5. Under Utah Code Ann. § 59–2–1325 (1996), "[a] tax upon real property is a lien against the property assessed" and that lien "attach[es] as of January 1 of each year." Therefore, liens for the real property taxes for each of the years in issue arose and attached to the real property.

6. The Utah Bankers Association argues in its amicus brief that the continued validity of *Black*

is irrelevant because amendments "have so changed the statute [Utah Code Ann. § 59–2–1302] that *Black* cannot be controlling in any event." We disagree. While the statute corresponding to section –1302 has been substantially changed over the years, that statute currently and in all previous versions relates only to the creation of a lien for personal property taxes on real property. The *Black* opinion's holding on priority was based on the statute currently codified at Utah Code Ann. § 59–2–1301, which has remained essentially unchanged, not only since *Black,* but since the initial codification of Utah's tax laws.

implication." *Black*, 67 Utah at 271, 247 P. at 487. Construing three adjacent sections of the tax code, the Court held that this requirement was satisfied.[7] The *Black* Court discerned the warrant for special priority in the following statutory language: "The judgment is not satisfied nor the lien removed until the taxes are paid or the property sold for the payment thereof." *Id.* at 272, 247 P. at 487. The Court reasoned that not granting special priority to tax liens would defeat the legislative purpose, evidenced in this language, that the lien remain on the property until the tax was paid or the property sold at tax sale. *Id.* at 277, 247 P. at 489. This provision remains in the code today, unchanged from the version considered in *Black*.

None of the Utah cases that has cited *Black* has explicitly overruled it. *See Nelson v. Stoker*, 669 P.2d 390 (Utah 1983); *Phillips Petroleum Co. v. Wagstaff*, 22 Utah 2d 177, 450 P.2d 100 (1969); *State ex rel. Tax Comm'n v. Evans*, 79 Utah 370, 6 P.2d 161 (1931). However, A.C. Financial, joined by amici Utah Land Title Association and Utah Bankers Association, argues that *Nelson v. Stoker* and *Phillips Petroleum Co. v. Wagstaff* implicitly overrule *Black* by rejecting its fundamental premises. We disagree. Both of these cases held that *Black* did not apply to the circumstances presented in those cases—in essence, each case distinguished *Black* on its facts.

In *Phillips*, the Court noted that unlike the liens for withholding taxes at issue there, the property tax liens challenged in *Black* were matters of public record. *Phillips*, 22 Utah 2d at 179, 450 P.2d at 102. Further-

more, the mortgagee could protect itself by foreclosing before multiple years' assessments accumulated. *Id.* That distinction is still clearly valid with respect to real property taxes, which attach automatically as of the beginning of the year in the amount assessed. However, the distinction may not apply to personal property tax liens on real property. Because the county must take affirmative steps to establish a lien for personal property taxes against the taxpayer's real property, the public record contains no indication that a claim for personal property taxes is being asserted against the real property until midway through the tax year. An additional difference not noted by the *Phillips* Court is that the lien in question in that case attached to *all* the personal and real property of the taxpayer rather than to specific property. *See id.* at 178, 450 P.2d at 100 (citing statute).

We are likewise not persuaded by A.C. Financial's argument that because the lien statute in *Phillips* contained language that more specifically provided for special priority for the withholding tax liens,[8] the *Phillips* Court's refusal to grant such priority weakens the argument for doing so in the fact situation presented by *Black*. *Phillips* simply did not consider the effect of the lien statute's language at all. We do not think that the general principle that the Legislature has power to give the State's liens special priority can be called into question at this point; therefore, if anything, the failure of *Phillips* to address the statutory provision apparently creating priority calls the correctness of that decision into question rather than *Black*.

7. Section 5995: "Every tax has the effect of a judgment against the person, and every lien created by this title has the force and effect of an execution duly levied against all personal property of the delinquent. The judgment is not satisfied nor the lien removed until the taxes are paid or the property sold for the payment thereof."
   Section 5996: "Every tax upon personal property is a lien upon the real property of the owner thereof, from and after twelve o'clock m. of the 1st day of January of each year."
   Section 5997: "Every tax upon real property is a lien against the property assessed; and every tax due upon improvements upon real estate assessed to others than the owner of the real estate is a lien upon the land and improve-

ments; which several liens attach as of the second Monday in January in each year."
*Black*, 67 Utah at 272, 247 P. at 487 (quoting 1917 Compiled Laws of Utah).

8. " 'Every employer who deducts and withholds any amounts under the provisions of this act shall hold the same in trust for the state of Utah ... and the state of Utah shall have a lien to secure the payment of any amounts withheld and not remitted ..., *which said lien shall be prior to any lien of any kind whatsoever including existing liens for taxes.*' " *Phillips*, 22 Utah 2d at 178, 450 P.2d at 101 (emphasis added) (quoting Utah Code Ann. § 59–14–71(3)(e) (1963)).

*Nelson* addressed a situation even further removed from the facts of *Black*. *Nelson* was *not* an attempt to collect taxes, but rather to enforce a judgment for child support. While the State had argued that the *Black* priority rule should apply because a statute provided that this child support judgment lien had " 'the same preference against the assets of th[e] debtor as claims for taxes,' " *Nelson*, 669 P.2d at 395 (quoting Utah Code Ann. § 78–45b–9(1) (1977)), the Court pointed out that this provision did not create a single standard for priority because different types of tax liens may enjoy different levels of priority. *Id.* The Court then concluded that the statute should be read to "only grant[ ] a priority to the State's judgment lien similar to the lowest priority given to a tax lien—that of an ordinary judgment lien." *Id.* Rather than calling *Black* into question, as A.C. Financial suggests, the *Nelson* Court expressly declined to reconsider the validity of *Black*, merely noting that its holding might not extend beyond the facts presented therein. *Id.*

Furthermore, the situation presented in *Nelson* is in important respects distinguishable from that before us in this case. As in *Phillips*, the lien was generalized, applying to all of the judgment debtor's assets rather than to a particular piece of property.[9] Also, the competing interest was a purchase money security interest in real property, which the *Nelson* opinion recognized as being entitled to priority over generalized liens because the credit is extended in reliance on the security of a particular piece of property.

Nor do we accept A.C. Financial's argument that we should now overrule *Black*. Among the factors which we have considered in deciding whether to overrule prior case law interpreting a statute are "the plausibility of the existing interpretation given the statute, the degree to which that interpretation has worked itself into the state of the law, and the strength of the arguments for changing that interpretation." *Hackford v. Utah Power & Light Co.*, 740 P.2d 1281, 1283 (Utah 1987). Although the statute relied on by *Black* to establish special priority certainly could be more clear,[10] the reading adopted by that case is not unreasonable given the statutory framework in existence at that time.[11] A.C. Financial points to the fact that

**9.** This is one difference between the statutory lien at issue in *Nelson* and an ordinary judgment lien, which attaches only to the real property of the judgment debtor located in the county where the judgment is docketed.

**10.** *Black* states:

"Every tax has the effect of a judgment against the person, and every lien created by this title has the force and effect of an execution duly levied against all personal property of the delinquent. *The judgment is not satisfied nor the lien removed until the taxes are paid or the property sold for the payment thereof.*"

67 Utah at 272, 247 P. at 487 (emphasis added) (quoting 1917 Compiled Laws of Utah, § 5995).

More recent statutory enactments in neighboring states provide examples of better clarity on the priority question. For example, Idaho Code 63–1003(2) (1996) provides:

Any delinquency on personal property taxes in accordance with the provisions of this title shall be a first and prior, perpetual lien, except as otherwise provided by law, upon such personal property and all real and personal property of the owner of such personal property until all property taxes due upon such personal property have been paid.

The relevant Wyoming statute states:

Taxes upon real property are a perpetual lien thereon against all persons excluding the United States and the state of Wyoming. Taxes upon personal property are a lien upon all real property owned by the person against whom the tax is assessed subject to all prior existing valid liens. Taxes upon personal property are a lien upon the personal property until paid but if the personal property is transferred before payment the tax shall be collected from other real or personal property of the transferor but if the transferor has no other property from which the taxes can be collected then payment shall be enforced from the transferred property.

Wyo. Stat. Ann. § 39–3–102(a) (1997).

Colorado's code provides:

Taxes levied on real and personal property, together with any delinquent interest, advertising costs, and fees prescribed by law with respect to any such taxes as may have become delinquent, shall be a perpetual lien thereon, and such lien shall have priority over all other liens until such taxes, delinquent interest, advertising costs, and fees shall have been paid in full.

Colo.Rev.Stat. § 39–1–107(2) (1997).

**11.** One aspect of the statutory scheme not considered by *Black* that also lends some support to the conclusion that special priority was intended is the portion of the lien statute providing that the effective date of the lien was the second Monday in January rather than the date on

*Black* has been infrequently cited and argues that the rule of *Black* has not become firmly rooted in the state of the law and that abandoning it would have little impact. It is impossible to say whether the dearth of citations indicates that the *Black* priority rule is little known or rather that it has been consistently assumed to be valid to the extent that it has not been directly challenged; however, it is worth observing that each annotated version of the Utah Code published since *Black* has included summaries of that case's holdings with the statutes construed. It is therefore hard to claim that the rule is unknown to those applying the law.

In addition, the holding of *Black* is more closely integrated into Utah law than is immediately apparent. Because *Black* involved not only liens for personal property taxes on real property, but also the liens for the real property taxes owed on the same parcel, it also brought into Utah law the widely accepted rule that *real property tax liens* have priority over all other claims on the property taxed. *Black* is the earliest Utah case for that rule, but later cases recognize the rule (although they do not cite *Black* for it) in holding that a tax sale extinguishes all prior private claims on the property. *See Hanson v. Burris*, 86 Utah 424, 438–39, 46 P.2d 400, 406 (1935) (acknowledging that purchasers of tax deed receive new title under independent grant of title which extinguishes all previous private titles and encumbrances); *see also Buchanan v. Hansen*, 820 P.2d 908, 910 (Utah 1991) (mentioning same); *Tuft v. Federal Leasing*, 657 P.2d 1300, 1303 (Utah 1982) (citing rule in *Hansen*). The statute providing for tax sales implicitly recognizes this rule and the underlying holding of *Black* with regard to real property taxes by defining the title granted at a tax sale as a "fee simple" title—i.e., one unencumbered by other claims. *See* Utah Code Ann. § 59–2–1351.1(9)(a) (1996); *cf. First NH Bank v. Town of Windham*, 138 N.H. 319, 639 A.2d 1089, 1091–92 (1994) (implying that special priority for tax lien gives effect to statutory tax sale notice provisions). Given that many mortgages and trust deeds—including the

trust deed in this case—contain multiple provisions to allow the lender to prevent its interest from being extinguished at tax sales, it is apparent that this aspect of special priority is well-recognized.

A.C. Financial argues that even the rule granting special priority to real property tax liens should be abandoned because of an absence in the code of language expressly granting such priority. That would constitute a dramatic shift in this Court's jurisprudence and run contrary to the legislative intent necessarily implied in the tax sale statute. The Utah Land Title Association and the Utah Bankers' Association, which urge us to overrule *Black* with respect to personal property tax liens, both support the continued application of special priority for real property tax liens.

We find the arguments for retaining the *Black* rule with respect to real property taxes to be clearly stronger than those for abandoning it. The rule is an effective device for ensuring that government is able to collect the taxes necessary for its operations. It is logically consistent with well-established concepts of title: because an owner in fee simple nevertheless remains subject to the State's claim on the property for taxes, it should follow that the owner cannot grant a lender a greater interest—one which is not subject to that claim. Not recognizing tax lien priority in the context of tax sales would significantly dilute the State's ability to dispose of property at such sales because the buyer would be subject to other claims on the property.

There is little or no evidence on the degree to which *Black*'s holding regarding the priority of personal property tax liens attached to real property has been integrated into Utah law. Affidavits presented by A.C. Financial assert that this aspect of the priority rule is not well known in the title insurance or mortgage lending industries. Neither the record nor the briefs provide any information about the frequency with which this rule has been used in the past. Again, the rule has been

---

which the taxes were assessed. *See Black*, 67 Utah at 272, 247 P. at 486 (citing 1917 Compiled Laws of Utah, § 5597). This provision thus dis-

regarded the traditional "first in time" rule for any interests created after the statutory date yet before taxes were assessed.

consistently included in the annotated statutes.

A.C. Financial and the amici offer several substantial policy reasons for granting personal property tax liens on real property a lesser priority than real property tax liens. Ultimately, these considerations are grounded in the fact that the personal property tax liens are being enforced against property other than that which gave rise to the tax obligation and the effect that this has on third parties who lend money on the security of this other property. In this context, a rule of special priority for personal property tax liens on real property creates the possibility that after a lender makes a loan secured by a mortgage or a trust deed, that security interest may be subordinated to a claim for subsequently accruing personal property taxes in an amount which is a substantial fraction of the value of the real property. When that happens, the value of the lender's security interest has been reduced to the extent that the total of the personal property tax obligation and the balance owed the lender exceed the value of the real property. This effect is possible despite the fact that tax obligations are generally a small percentage of the value of the taxed property because there is no necessary relationship between the value of the real property and the value of any personal property the borrower may acquire—the taxes being enforced against the real property are not based on the value of the real property. In contrast, the assessed taxable value of real property collateral will have at least a rough relationship to the actual market value of the property, so that the taxes assessed in a single year would reduce the lender's total security only in the most unusual circumstances.

A.C. Financial and amici have also argued that the uncertainty facing a lender with regard to subordination of its security interest to personal property tax liens on the real property would adversely affect the marketability of Utah mortgages and trust deeds in the national secondary mortgage market. We have no way of gauging how likely that is, just as we have no way of knowing how often the personal property taxes would in fact impair security.

Aside from the arguments presented by A.C. Financial and amici, there are additional indications that special priority for personal property tax liens on real property may pose problems for lenders. For example, until being amended in 1988, section 59–2–1302 conditioned the State's ability to attach the personal property taxes on the fact that "the total assessed valuation of the personal property which is listed with the real property is not in excess of double the assessed valuation of the real property." Utah Code Ann. § 59–2–1302 (1987). This provision recognizes that a problem may exist when personal property tax assessments are large in relation to the value of the real property. Montana, which permits the attachment of personal property tax liens to real property, has acknowledged the potential problems raised by that attachment by providing various protections for holders of mortgages or contractual liens on the real property.[12]

A.C. Financial also argues that subordinating lenders' mortgages and trust deeds to claims for taxes on unrelated property is simply unfair to those lenders. This argument has some merit. Traditionally, courts have justified the special priority of tax liens on the rationale that because the owner of taxed property cannot ever escape the obligation to pay taxes on that property, the owner cannot convey an interest in the property which is not subject to that tax claim. However, that rationale is absent for "crossover" tax liens, such as the personal property tax liens at issue here, because the tax obligation is related only to the owner of the real

---

12. Under the Montana statute, the personal property tax lien is automatically attached to the taxpayer's real property. Mont.Code Ann. § 15–16–402 (1997). However, a lienholder can, by filing a notice with the county clerk before the taxes become a lien, prevent the attachment of taxes based on taxable values exceeding $10,000. Id. (The lienholder is also entitled to request a statement of personal property taxes that are due. Id.) In addition, when the real property owner has failed to pay personal property taxes for at least one year, the lienholder can request that the owner's real and personal property be separately assessed, and then "the personal property taxes may not be a lien upon the mortgaged real property." Id. § 15–16–402(5).

property, not to the real property itself.[13]

Although there are valid policy reasons for giving personal property tax liens different priority than real property liens, policy considerations are the province of the Legislature, not of this Court. While we find the *Black* rule problematic when applied to personal property tax liens imposed on real property, we conclude that the priority of such liens over preexisting mortgage or trust deed liens should not be eliminated. We recognize that special priority for such liens can create uncertainties for lenders who extend credit on the security of real property. On the other hand, lenders do have devices available to reduce the impact of this rule. The standard mortgage and trust deed provisions used to protect lenders from real property tax sales can be applied to these tax obligations as well. For example, the provisions in the trust deed in this case were drafted in sufficiently broad terms that upon the initial attachment of personal property taxes, the lender could have either foreclosed or paid the taxes and added them to the balance of the note.

Furthermore, in many cases the lender is or ought to be aware of the nature of the business conducted by the prospective borrower, which should alert the lender to the possibility of the borrower's being subject to personal property assessments that may be large enough to endanger the security of the real property. Here, the borrower was a construction and engineering company; obviously, such an enterprise is likely to own expensive personal property.

Finally, as amicus Utah Association of Counties points out, the statute authorizing the sale of real property to satisfy tax obligations—and which specifies that the deed given following such a sale is a fee simple deed—does not distinguish between tax liens on the property arising out of real property taxes and those arising out of personal property taxes. *See* Utah Code Ann. § 59–2–1351.1. The *Black* opinion likewise made no

such distinction. We can therefore discern no principled basis under the statute for retaining special priority for liens arising out of real property taxes while rejecting such priority for liens arising from personal property taxes. Hence, we decline to take that step.

On the basis of the foregoing, we must affirm the summary judgment in favor of the County with regard to its tax liens for real property taxes. Those liens arose by operation of statute during each of the years in question and are entitled to priority over the trust deed interest. Furthermore, any valid liens the County has for unpaid personal property taxes will also be accorded special priority. We now consider the remaining question: whether the parcels are subject to liens for personal property taxes.

## II. EXISTENCE OF LIENS FOR PERSONAL PROPERTY TAXES

A.C. Financial asserts that for each of the years in question the County failed to satisfy the statutory requirements for establishing a personal property tax lien on real property and that the trial court's ruling that such liens were valid was therefore error. The County responds that the statute's requirements were satisfied and that, in any event, A.C. Financial has not carried its burden of demonstrating that the liens are invalid. The County also argues that because A.C. Financial had actual and constructive notice of the claimed liens when it acquired the trust deed from First Interstate Bank, it cannot call the liens' validity into question. Both parties below moved for summary judgment on whether the liens for personal property taxes existed; the trial court ruled that the liens did exist, granted the County's motion, and denied A.C. Financial's motion.

■ We first briefly respond to the County's argument that A.C. Financial may not

---

**13.** Amicus Utah Land Title Association suggests that because of the possible effect on lenders' security interests, recognizing special priority for personal property tax liens on real property might violate due process. The Land Title Association does not directly assert that due process

is violated but simply urges that interpreting the statute not to grant special priority for these liens would avoid a constitutionally questionable construction. Neither of the parties has briefed or argued the due process issue, and we decline to address it.

challenge the existence of the liens because it had actual and constructive notice of the liens prior to purchasing the trust deed from First Interstate Bank in 1992. We are not persuaded by this argument. Inherent in the notion that A.C. Financial succeeded to First Interstate Bank's interest in the property is the understanding that A.C. Financial also succeeded to the priority accorded to that interest. The County's claims against the property were not made of record until after the trust deed was given by Gardner to First Interstate Bank. Making the original deed of trust subject to those claims simply because it has been transferred to another party would make it difficult or impossible to sell trust deeds or mortgage interests whenever another claim on the same property has arisen since the creation of that interest.

### A. Statutory Requirements for Lien Creation

Resolution of the question of whether the County has valid liens for personal property taxes depends on what the statute authorizing such liens requires and whether those requirements were satisfied in this case. The existence of a valid statutory lien rests entirely on whether the terms of a statute creating the lien have been met. Tax lien statutes are construed strictly so that liens are not expanded by implication. 72 Am.Jur.2d State and Local Taxation § 891 (1974) ("Tax liens are not to be extended by implication or enlarged by judicial construction." (footnote omitted)). Liens for personal property taxes are authorized by Utah Code Ann. § 59-2-1302. That section provides in relevant part:

(2)(a) Every unpaid tax ... upon personal property listed with the real property before May 15 is a lien upon the real property of the owner as of 12 o'clock noon of January 1 of each year.

(b) The personal property listing shall be made either:

(i) on the record of assessment of the real property; or

(ii) by entering a reference which shows the record of the assessment of the personal property on the record of assessment of the real property.

The dispute in this case over the existence of the personal property tax liens turns on the meaning of subsection (2)(a). A.C. Financial argues that this subsection requires the County to list the delinquent personal property taxes on the real property records before May 15 of the year in which the taxes accrue and that if that deadline is missed, then no lien on the real property for those taxes arises. The County urges us to read this language to say that if the listing is made after May 15 of the accrual year, then the lien will nevertheless arise at a later time.

It is unclear exactly which of several possible scenarios the County would find under the statute. If a lien is possible from a later listing, the statute could still be given different applications. For example, it could be read to require some affirmative act of listing to take place in the January 1 to May 15 period of the later year for the lien to arise; a second possible option is that listing between May 15 and December 31 could simply result in the lien's coming into being at the beginning of the following year; third, it could be understood to mean that listing after the initial January 1 to May 15 period results in the lien's arising at the time of the later listing rather than having retroactive effect to January 1 of that year. We conclude that A.C. Financial's interpretation is the better one.

To reach the County's interpretation of subsection (2)(a), we would have to ignore the phrase "before May 15" or else construe the statute as creating a lien that operated independently from the final phrase of the provision, "as of 12 o'clock noon of January 1 of each year" whenever the personal property was listed after May 15th. Ignoring the first phrase is obviously untenable in light of the rule of construction requiring us to give meaning to all provisions in a statute. See State v. Hunt, 906 P.2d 311, 312 (Utah 1995) (" '[A]ny interpretation which renders parts or words in a statute inoperative or superfluous is to be avoided.' " (quoting United States v. Rawlings, 821 F.2d 1543, 1545 (11th Cir. 1987))). Interpreting the statute as providing separate effects for listings before and after May 15th likewise does not work be-

cause there is no grammatical basis for deriving two independent effects from this single sentence—the sentence cannot be fairly read to say both that taxes listed before May 15 are a lien on the real property as of January 1 and that taxes listed with the real property after May 15 are a lien on the real property, but not as of January 1. The sentence is better read to mean that the May 15 deadline must be met for the lien to be created at all and that the lien thus created is deemed to arise at the beginning of the year.

This reading is also supported by subsection (2)(a)'s legislative history. Prior to 1953, the tax code provided that personal property taxes automatically attached to the taxpayer's real property.[14] Under the provision then in effect, the existence of the lien was presumed, created by the statute as of the date specified. The Legislature then imposed both of the requirements mentioned in the present version: listing, and listing before a particular date.[15] It is logical to construe a change which conditioned lien creation on the affirmative action of listing to also require that the listing take place by a particular time. In addition, the language used in this first version of the statute quite clearly contemplates listing before the statutory date in the accrual year: *"provided that such personal property is listed with the real property before July 1st of the year in which the personal property tax becomes a lien."* 1953 Utah Laws, ch. 109, § 1 (second emphasis added). The caption of the 1953 act suggests that the Legislature wished to condition the existence of the lien on the proper listing: "An Act ... Providing that a Tax Upon Personal Property Shall Be a Lien Upon the Real Property of the Owner of the Personalty Taxed, When Such Personalty and the Tax Thereon are Listed With Such Real Property on the Assessments Rolls." *Id.* The language "of the year in which the personal property tax becomes a lien" was deleted in 1988 and replaced with "is a lien

upon the real property of the owner of the property as of 12 o'clock m. of January 1 of each year." *See* 1988 Utah Laws, ch. 3, § 159 (amending Utah Code Ann. § 59–2–1302 (1987)). The amending statute was presented to the Legislature as part of a recodification of the tax code, with no substantive change intended. Recording of Proceedings of the Utah Senate, 1988 Gen. Sess., January 20, 1988, Disk 15, meter 16, 27, 30 (Utah Senate Office). This supports the conclusion that "of each year" is intended to convey the meaning that the listing must take place before the deadline in the accrual year. The 1988 legislation effected the most substantial changes in this provision, dividing the single paragraph into different sections and incorporating portions of existing statutes related to duties of the assessor connected to collecting these taxes. Adopting the interpretation that the listing could take place in a later year during the January 1 to May 15 period would create confusion about whether a listing made between May 16 and December 31 that remains in the records as of January 1 of the following year is "listed before May 15 of each year." It is more reasonable to read the statutory language to require listing before May 15 of the accrual year.

Our general conclusion that personal property tax liens attached to real property are entitled to special priority offers additional support for reading subsection (2)(a) in this manner. In the context of special priority, adopting the County's argument that liens can be created by a later listing would make the May 15 deadline entirely meaningless because there would be no difference in the effectiveness of a lien created before the deadline in the accrual year and one created several years later. For example, if a lien is held to arise on January 1 of the following year yet enjoys special priority, then the only difference between a lien created by listing on May 14 of the accrual year and one creat-

---

**14.** "Every tax upon personal property is a lien upon the real property of the owner thereof, from and after 12 o'clock m. of the 1st day in January of each year." Rev. Stat. of Utah § 80–10–2 (1933).

**15.** Every current tax upon personal property is a lien upon the real property of the owner there-

of from and after 12 o'clock m. of the first day in January of each year, *provided* that such personal property is listed with the real property before July 1st of the year in which the personal property tax becomes a lien.
1953 Utah Laws, ch. 109, § 1 (amending Utah Code Ann. § 59–10–2 (1953)).

ed by a listing on May 14 of the following year is that there would be no indication of this latter lien in the real property records during the accrual year. Because real estate tax sales only take place four years after an initial delinquency, the later-creation approach would permit as many as three years of personal property tax delinquencies to accumulate and then be listed with the real property record, providing the first notice of any problem to a lender.

Reading the statute to restrict the creation of these personal property tax liens on real property to a relatively short period at the beginning of the accrual year accords recognition to important differences between real property taxes and personal property taxes. The Legislature's awareness of these differences in first requiring listing of personal property taxes is illustrated by the portion of that first provision which prevented listing personal property that was more than twice the value of the real property to be attached. 1953 Utah Laws, ch. 109, § 1.[16] The most obvious reason for imposing a listing requirement is to notify those who have or are considering acquiring an interest in the real property that that interest has become subject to the government's claim for taxes. The fact that such notice is needed arises from the lack of an inherent and obvious connection between personal property taxes and real property. The Legislature did not make a distinction between real and personal property tax liens with regard to priority once they were created, but clearly intended some distinction with regard to the manner in which the different liens are created. We believe it is consistent with that intent to make it somewhat more difficult for the State to obtain the lien for personal property taxes against real property. Strictly enforcing the May 15 deadline should not be a substantial

burden on the County because the current practice of the Personal Property Division of the County Assessor's Office assumes that that date is a binding deadline.[17] In any event, the statutory taxing scheme requires that all assessments be complete by May 22, Utah Code Ann. § 59–2–303, and that the assessor, when personal property taxes are due, either collect the tax, attach the amount owed to real property, or obtain a bond for the payment of the taxes by November of that year. Utah Code Ann. § 59–2–1302(1). Finally, another subsection was added to section 59–2–1302 in 1992 (the final tax year at issue in this case) providing that if the County fails to list the personal property taxes with the real property a lien is created on the taxed personal property itself. "Every unpaid tax ... upon personal property not listed with the real property of the owner is a lien on that personal property as of 12 o'clock noon of January 1 of each year." 1992 Utah Laws, ch. 237, § 5.

We are unconvinced by the County's arguments against interpreting subsection (2)(a) to make listing by May 15 a prerequisite to lien creation. The County suggests that Utah Code Ann. § 59–2–1314 provides a basis for excusing the failure to complete the personal property tax listing by May 15. Section 59–2–1314 states, "No assessment or act relating to assessment or collection of taxes is illegal on account of informality or because the assessment or act was not completed within the time required by law." Although listing the personal property tax with the real property records is "an act relating to collection" that is "required by law" to be completed by May 15, the County's argument overlooks a key distinction: an act may be ineffective without being illegal. Section 59–2–1314 is immediately preceded in the code by a provision instructing the Attorney Gen-

---

**16.** Such listing shall be made either on the same sheet with the record of assessment of the real property or by entering on the sheet whereon the assessment of the real property is recorded a reference which shows the record or records of the assessment of the personal property; *provided further* that the total assessed valuation of the personal property which is listed with the real property is not in excess of double the assessed valuation of the real property. 1953 Utah Laws, ch. 109, § 1.

**17.** In deposition testimony, C. Allen Tippetts, director of the Personal Property Division of the Salt Lake County Assessor's Office, explained the purpose of a printout of tax accounts to be attached to real property, which the Division creates on or just before May 15: "The purpose of that list is to establish those accounts which have been flagged prior to the May 15th deadline for according to statute, in order for an attachment to be a lien on real property, it has to be attached prior to May 15th."

eral to prosecute state officers who are delinquent in the collection of revenue. *See* Utah Code Ann. § 59–2–1313. Section 59–2–1314 thus delineates a particular circumstance when assessors or other officers should not be prosecuted for delinquency in performing their statutory duties; however, that is a separate question from whether the statutory requirements for creation of a lien have been satisfied.[18] Adopting the County's view of this statute would effectively write every statutory deadline out of the tax code.

The County also asserts that a 1988 amendment to section 59–2–1302(2)(a) provides evidence of an intent to permit creating liens for prior years' taxes. In 1988, this subsection was amended to replace, in the first sentence of (2)(a), "Every current tax" with "Every unpaid tax." 1988 Utah Laws § 159. The County argues that "unpaid tax" sweeps more broadly than "current tax," encompassing taxes assessed in prior years. While the change could be read as the County suggests, such an interpretation is not necessary. One reading that accounts for the change in wording and is still consistent with the established scheme is that the change acknowledges the possibility that there may have been escaped property which was *assessed for the first time in the listing year for taxes that should have been paid in prior years.* Such taxes would not strictly be "current," because they arise from the tax obligation of previous years. Yet the fact that the property escaped assessment in the earlier year means that the County would have had no reason to attempt to collect it then, and so no reason to have attached it to the real property. From this perspective, allowing attachment of an "unpaid" tax permits all collection efforts to be applied to taxes for escaped property *in the year in which those taxes are first assessed.* That would accord with the Legislature's intent that no substantive change be made in the tax code and would not create a conflict with the May 15 deadline.

The County also argues that it satisfied all of the statutory listing requirements before

A.C. Financial purchased the trust deed in 1992 and that it therefore has valid liens against A.C. Financial. However, this argument ignores the fact that what A.C. Financial purchased was an *existing* interest in the real property. This bypasses the question of whether the statutory requirements for lien creation were satisfied. Essentially, the County is arguing that A.C. Financial had actual notice of the County's claimed liens prior to A.C. Financial's purchase of the trust deed. While there is some suggestion in the record that such actual notice may have existed on the part of A.C. Financial, adoption of the County's position would render it impossible to sell property interests which were created prior to and without notice of any claims once a concededly inferior claim has been asserted against the property.

We conclude our discussion of the statutory requirements for establishing a lien for personal property taxes on real property with a brief summary of what constitutes "listing" under the statute. Section 59–2–1302(2)(b) provides, "The personal property listing shall be made either[ ] (i) on the record of assessment of the real property; or (ii) by entering a reference which shows the record of the assessment of the personal property on the record of the assessment of the real property." Under this provision, listing can be satisfied either by annotating the real property records with a statement of the amount of personal property taxes owed (the first option), or by putting a cross-reference in the real property record which directs anyone reading that record to consult the personal property assessment records to see what amount of personal property taxes is attached to the real property. Both of these provisions are a means of giving notice to a person examining the real property records.

## B. Whether the Statutory Requirements Were Satisfied

We conclude that the County failed to satisfy the requirements to create a personal

---

**18.** In the context of personal property taxes, for example, section 59–2–1302(1) requires the assessor, at the time of assessment, to either make the listing on the real property records, immediately collect the taxes, or obtain a bond before the due date of the taxes. Section 59–2–1314 might protect the assessor from prosecution for a technical noncompliance with these requirements.

property tax lien on the real property for the 1988 and 1989 personal property taxes. After reviewing the record and "view[ing] the facts in the light most favorable to the non-moving party," *Schnuphase v. Storehouse Markets,* 918 P.2d 476, 477 (Utah 1996), we also conclude that the trial court improperly granted summary judgment for the County on the existence of those liens for 1990 through 1992.

We must first make clear the actions by which the County could have met the statutory requirements. The Personal Property Division of the Salt Lake County Assessor's Office begins sending out affidavits of personal property for general personal property about the second or third week in January. The taxpayer is required to list all the taxpayer's taxable personal property, together with its value, and must use the taxation rate provided to calculate the tax owed. The taxes are due thirty days after the Division mails the affidavit to the taxpayer. If the tax is not remitted by the due date, the Division begins collection efforts over a sixty-day collection period. Actual seizure of the personal property is generally put off to the end of the sixty-day period. Early in this collection period, the Division attempts to determine if the delinquent taxpayer has any real property to which the taxes can be attached. If real property is discovered, the collector submits an attachment form that is reviewed by a supervisor and the Division director before final approval for attachment is given. After approval, the supervisor enters into the Division's computer records of personal property an on-screen notation or "flag" which lists the real property parcel number and indicates that the taxes are to be attached to this property ("flag 1").

Once flag 1 is in place, the collection agents no longer attempt to collect the taxes.

The Division director explained that every Monday, the Division runs a computer program which sweeps through the Division's computer property records, identifies those accounts marked with flag 1, collects the flagged accounts, and then accesses the computer records of real property in the Treasurer's Office and creates on the real property records corresponding to the parcels listed in flag 1 a notation that personal property taxes have been attached to that real property ("flag 2"). At this point, the amount of personal property tax is *not* included in the real property records. Immediately prior to May 15 of each year, the Division prints a list of all the personal property accounts to be attached to real property. This printout appears to be generated from the Division's records and therefore would apparently include all flag 1 accounts, whether or not a flag 2 had been generated from those accounts. Finally, sometime in October, a different computer program sweeps the personal property records, collects the amount of tax listed on all flag 1 accounts, and moves the amount of personal property tax off the personal property records and onto the real property records.[19] When flag 2 is created, anyone reviewing the real property records would be informed that personal property taxes have been linked to a particular parcel and would be directed to the personal property records for the amount of tax. This satisfies the second statutory option of "a reference which shows the record of the assessment of the personal property on the record of the assessment of the real property." However, flag 1 exists only in the personal property records and therefore does not satisfy the statutory requirements for listing. If flag 2 is in place in the real property records by May 15, then the statutory requirements for lien attachment have been satisfied.

19. A.C. Financial disputes that the weekly program described above exists. The director of the Personal Property Division described both of these programs in his deposition. Neal Howell, the county employee who maintained the computer programs for the Personal Property Division, described only the yearly program which is run in October and said that there were no other computer programs that would flag attached accounts. Howell later reviewed and corrected his deposition to accord with the Division director's description of two programs and submitted an affidavit to the court describing the separate programs (according to this document, the yearly program actually consists of two programs). A.C. Financial argues that Howell should not have been allowed to change the deposition or submit the affidavit and therefore argues that no weekly program exists. It also argues that the existence of the weekly program is immaterial because the County cannot prove that the specific real property records at issue were flagged.

The County conceded below that the 1988 and 1989 personal property taxes were not listed with the real property records until after May 15, 1989. Therefore, the statutory requirement of listing before May 15 of the year of accrual was not met and no personal property tax liens arose for those years.

■ Whether the appropriate listing occurred in 1990, 1991, and 1992 is a more difficult question. Evidence in the record suggests that it is extremely likely that the listing was made by May 15 in 1990 and 1991 and that it is likely that the deadline was met in 1992. With regard to 1990, the record contains a copy of Gardner's personal property tax affidavit showing that Gardner owed $14,352.60 in taxes for that year. The tax was due and the affidavit was completed on March 9; the affidavit was stamped as received by the Assessor's Office on March 22. The record also includes a letter from Gardner to the Assessor's Office dated March 9 which asks that the personal property affidavit be attached to the real property. A report titled "Personal Property to be Attached to Real Property 1990," dated May 14, 1990, shows about $14,000 in taxes to be attached to Gardner's real property. It is therefore very likely that flag 1 was entered before Monday, May 14, 1990, the last date before May 15 when the computer program that creates flag 2 would have been run. Likewise, the 1991 report of property to be attached, dated May 14, 1991, shows about $4,200 in taxes attached to Gardner's real property. May 14, 1991, was a Tuesday, so unless flag 1 was created after the program was run the day before, flag 2 should have been created by May 15 of that year. The evidence available to us as to when the 1992 personal property taxes may have been listed is somewhat weaker, however. In 1992, the "Personal Property to be Attached" report was generated on May 15, but that date fell on Friday that year, leaving almost a week in which flag 1 could have been created while flag 2 was not. Although the record evidence provides grounds to conclude that the proper listing was likely made before the deadline, the County has not provided direct evidence that the listing was made on the particular parcels in question before the May 15 deadline in 1990 through 1992. Further-

more, there is some uncertainty about precisely when the existing procedures described by the Personal Property Division were put into place, since the Division director explained in his deposition that many of these procedures were instituted over time, beginning when the director was appointed to that position in 1988 or 1989. Some of these procedures thus may not have been in use until 1990 or later. Because we review the facts in the light most favorable to the nonmoving party, the County's failure to provide any direct evidence about when the 1990–1992 personal property taxes were listed, as well as the possibility that the listing may have taken place after the last computer sweep before the deadline, together preclude summary judgment for the County because there remains a material issue of disputed fact.

■ However, that result does not compel the conclusion that summary judgment in favor of A.C. Financial is appropriate on this question. The mere failure of one party to satisfy the requirement of summary judgment does not justify the grant of a cross-motion for summary judgment. See Amjacs Interwest, Inc. v. Design Assocs., 635 P.2d 53, 55 (Utah 1981). When considered as the moving party, A.C. Financial would have the burden of producing evidence showing that the County failed to list the personal property taxes by the deadline. Once it had satisfied that burden, the County would be obligated to produce some rebuttal evidence in support of its position. See Jensen v. IHC Hospitals, 944 P.2d 327, 339 (Utah 1997). Furthermore, the above facts, construed in the light most favorable to the County, would at least suffice to create an issue of material fact.

Pointing to deposition testimony, A.C. Financial disputes the existence of the weekly computer program that generates flag 2 and therefore asserts that neither flag 2 nor an equivalent would have been created until October of any of these years, when the amount of personal property tax was transferred to the real property records for inclusion in the real property tax notices. The County responds that that deposition testimony was

corrected by the witness when he reviewed it and further submitted an affidavit consistent with the corrected testimony. This dispute would therefore appear to preclude summary judgment on this issue in favor of either party. *See Draper City v. Estate of Bernardo,* 888 P.2d 1097, 1100 (Utah 1995) ("On a motion for summary judgment, a trial court should not weigh disputed evidence, and its sole inquiry should be whether material issues of fact exist."). A.C. Financial asserts that even if the weekly computer program exists, it is impossible for the County to prove that flag 2 was created for any of the personal property tax claims at issue here. While that appears to be true on the state of the record before us, we are unable to conclude that the County would be unable to do so if given the opportunity to take the issue to trial.

## CONCLUSION

We reaffirm *Union Central Life Insurance Co. v. Black,* 67 Utah 268, 247 P. 486 (1926), and hold that liens on real property for real and personal property taxes enjoy priority over previously existing private contractual interests in the same real property. Thus, we affirm that portion of the trial court's ruling that granted summary judgment to the County on its claim for judicial foreclosure of liens for unpaid real property taxes. We further hold that to attach liens for unpaid personal property taxes to real property, either the amount of unpaid tax or a reference to the location of the tax in the personal property records must be entered in the real property records by May 15 of the year in which the personal property taxes accrue. Since the County conceded below that the personal property taxes for 1988 and 1989 were listed in the real property records sometime after May 15, 1989, we reverse the summary judgment for the County on the existence of liens for those years' personal property taxes. We conclude that a disputed issue of fact remains as to whether the personal property taxes for 1990, 1991, and 1992 were listed with the real property records by May 15 in each of those years. We therefore reverse the grant of summary judgment for the County on the existence of liens for those years and remand to the trial court for further proceedings consistent with this opinion.

ZIMMERMAN, C.J., and HOWE, DURHAM and RUSSON, JJ., concur.