2006 UT 84

### UTAH STATE TAX COMMISSION, Petitioner,

v.

### Eric STEVENSON, Respondent.

### No. 20050521.

Supreme' Court of Utah.

Dec. 15, 2006.

Mark L. Shurtleff, Att'y Gen., Gale K. Francis, Asst. Att'y Gen., Salt Lake City, for petitioner.

Noel S. Hyde, South Ogden, for respondent.

PARRISH, Justice:

¶ 1 The Utah State Tax Commission (the "Commission") argues that the Utah Court of Appeals misinterpreted Utah Code section 59–1–302 in reversing the Commission's decision to personally assess Eric Stevenson for withholding taxes owed by Tower Communications, Inc. ("Tower"). We affirm in part and reverse in part, concluding that Stevenson was not willful in failing to collect the unpaid taxes.

## BACKGROUND

### I. FACTUAL HISTORY

¶ 2 In 1999, Stevenson, Ken Steckelberg, and Brett Cherry formed Tower as a Utah corporation that installed cable hardware for communications businesses. Steckelberg served as president and controlled the day-to-day management of Tower. His duties included the preparation and review of all of Tower's bills and invoices. He performed these duties with the assistance of a bookkeeper whom he hired and supervised.

¶ 3 Stevenson was Tower's secretary and treasurer. Even though he was not involved in Tower's day-to-day operations, he had exclusive authority to sign checks for the busi-

ness. He was also concurrently employed full-time as a loan officer for the Bank of Utah (the "Bank") and visited Tower's offices only about once a month. During these visits, Stevenson signed checks prepared by Tower's bookkeeper, often doing so without reviewing any accompanying documentation or company records.

¶ 4 Tower filed timely state withholding tax returns for the final quarter of 1999 and the first quarter of 2000. But Tower failed to file any returns or make any tax payments for the last three quarters of 2000. During this period, Steckelberg assured Stevenson that Tower's finances were in good order. In November 2000, however, third parties alerted Stevenson to financial troubles at Tower.

¶ 5 With the help of an accountant, Stevenson undertook a review of Tower's financial status and discovered serious problems, including Tower's failure to pay withholding taxes during the last three quarters of 2000. Stevenson and Cherry immediately fired Steckelberg, dissolved the business, and hired legal counsel to address Tower's financial and legal problems.

¶ 6 Tower owed the Bank over $80,000 on a loan that Stevenson and Cherry had personally guaranteed. The loan was secured by Tower's accounts receivable, and the Bank had perfected its security interest in those accounts receivable. While winding up the business, Stevenson determined that XO Communications ("XO") owed Tower approximately $83,000 (the "Account Receivable"), which XO refused to pay until Tower paid the outstanding claims of several subcontractors and suppliers (collectively, the "Subcontractors"). Using personal funds, Stevenson purchased the claims of the Subcontractors for around $16,000 (the "Personal Funds"), clearing the way for XO to pay Tower. Rather than having XO pay Tower directly, however, Stevenson arranged for XO to submit the payment directly to the Bank, thereby repaying Tower's loan and satisfying the Bank's security interest in Tower's accounts receivable.

¶ 7 In July 2002, the Commission assessed Stevenson a personal penalty of $12,018.04 for Tower's failure to pay withholding taxes for the second, third, and fourth quarters of 2000. The record reveals no prior assessment made by the Commission against either Tower or Stevenson. And at oral argument, counsel for the Commission confirmed that the Commission made no assessment for Tower's unpaid withholding taxes prior to the assessment against Stevenson in July of 2002.

## II. PROCEDURAL HISTORY

¶ 8 In a redetermination hearing, an administrative law judge (the "ALJ") concluded that Stevenson was liable for Tower's unpaid taxes as a responsible party under Utah Code section 59–1–302(2). More specifically, the ALJ determined that Stevenson "willfully" failed to collect the tax by (1) "recklessly disregard[ing] obvious . . . risks" of nonpayment, and (2) making a "voluntary, conscious, and intentional decision to prefer" the Bank over the state. Utah Code Ann. § 59–1–302(7)(b) (2004).

¶ 9 The Utah Court of Appeals reversed and remanded. *Stevenson v. Tax Comm'n*, 2005 UT App 179, ¶ 26, 112 P.3d 1232. Reviewing the ALJ's determination of Stevenson's willfulness as a mixed question of fact and law, *id.* ¶ 10, the court of appeals held that Stevenson did not recklessly disregard an obvious risk of nonpayment, *id.* ¶ 17. In the court's view, Stevenson's conduct constituted "mere negligence, not recklessness." *Id.* The court focused on two facts: (1) that Tower "had [no] history of failing to pay taxes that would place [Stevenson] on notice" of a risk of nonpayment, and (2) that Stevenson was "not directly involved in the accounting and disbursement of taxes." *Id.*

¶ 10 The court of appeals also rejected the ALJ's determination that Stevenson preferred the Bank over the state by arranging for XO to submit the Account Receivable directly to the Bank. Recognizing that Utah courts had never interpreted section 59–1–302, the court turned to federal case law for guidance. *Id.* ¶¶ 15, 18. It applied the two-part test articulated by the U.S. Court of Federal Claims under which a responsible party voluntarily and intentionally prefers other creditors over the state if he (1) " 'had

actual knowledge of the specific tax delinquency for which the penalty was assessed,' " and (2) had " 'unencumbered funds available to pay the taxes at the time the taxes came due.' " *Id.* ¶ 18 (quoting *Ghandour v. United States*, 36 Fed.Cl. 53, 62 (1996)). Because it is undisputed that Stevenson had actual knowledge of the tax delinquency at the time he directed the payment of the Account Receivable to the Bank, the court focused its review on the second prong. *Id.*

¶ 11 In determining whether the Account Receivable constituted "unencumbered funds," the court of appeals relied on *Honey v. United States*, 963 F.2d 1083, 1090–92 (8th Cir.1992), in holding that "funds only become encumbered once a secured creditor restricts the company's use of the funds or otherwise intervenes to prevent payment of taxes." *Stevenson*, 2005 UT App 179, ¶ 19, 112 P.3d 1232. In the court's view, the Commission was therefore required to "present evidence that the Bank ... declined to exercise its right to the [Account Receivable] and that Stevenson was free to apply a portion of the [Account Receivable] to pay Tower's tax obligation." *Id.* ¶ 23. Accordingly, the court remanded the matter to permit the Commission to introduce evidence that the Account Receivable was unencumbered. *Id.* ¶ 24.

¶ 12 Despite the fact that the ALJ's decision had not referenced the Personal Funds, the court of appeals considered the Commission's argument that the Personal Funds Stevenson used to purchase the outstanding claims of the subcontractors and suppliers became unencumbered corporate funds available to pay the withholding taxes. The court concluded that the Personal Funds were "not available to pay Tower's withholding taxes" and "deem[ed] them encumbered" under its two-part "unencumbered funds" test. *Id.* ¶ 22. Finally, the court of appeals adopted a "reasonable cause" defense recognized by some (but not all) federal circuit courts of appeals. *Id.* ¶ 25.

¶ 13 The Commission petitioned for certiorari, which we granted. We have jurisdiction under Utah Code section 78–2–2(3)(a), (e)(ii).

## ANALYSIS

¶ 14 Under Utah Code section 59–10–406, employers must file quarterly withholding tax returns and pay withholding taxes to the Commission. Funds withheld from employees' paychecks are held "in trust for the state." Utah Code Ann. § 59–10–406(6) (2004). If an employer fails to pay the taxes, the Commission may levy a personal assessment against certain responsible parties for the unpaid taxes:

> Any person required to collect, truthfully account for, and pay over any [withholding] tax ... *who willfully fails to collect the tax*, fails to truthfully account for and pay over the tax, or attempts in any manner to evade or defeat any tax or the payment of the tax, shall be liable for a penalty equal to the total amount of the tax evaded, not collected, not accounted for, or not paid over.

*Id.* § 59–1–302(2) (emphasis added).

¶ 15 For a responsible person's conduct to be "willful," he need not possess any "bad motive or specific intent to defraud the government or deprive it of revenue." *Id.* § 59–1–302(7)(c). The statute instead provides specific standards defining willfulness:

> It is prima facie evidence that a person has willfully failed to collect, truthfully account for, or pay over any [withholding] taxes ... if the commission or a court finds that the [responsible] person ...:
>
> (i) *made a voluntary, conscious, and intentional decision to prefer other creditors* over the state government or utilize the tax money for personal purposes;
>
> (ii) *recklessly disregarded obvious or known risks*, which resulted in the failure to collect, account for, or pay over the tax; or
>
> (iii) failed to investigate or to correct mismanagement, having notice that the tax was not or is not being collected, accounted for, or paid over as provided by law.

*Id.* § 59–1–302(7)(b) (emphasis added).

¶ 16 It is clear from the language of Utah Code section 59–1–302 that our legislature patterned the willfulness framework after the federal model. First, section 59–1–302(2), which establishes personal liability for will-

fulness, mirrors its federal counterpart, 26 U.S.C. § 6672(a) (2000), almost entirely.[1] Second, the three willfulness standards found in subsections 59–1–302(7)(b)(i)–(iii) were taken almost verbatim from well-developed federal case law. The Tenth Circuit case of *Denbo v. United States*, 988 F.2d 1029, 1033 (10th Cir.1993), demonstrates the similarities:

> Willfulness ... means a *voluntary, conscious and intentional decision to prefer other creditors over the Government.* ... Although negligence does not give rise to section 6672 liability, the willfulness requirement is ... met if the responsible officer *shows a reckless disregard of a known or obvious risk* that trust funds may not be remitted to the government.... A responsible person's *failure to investigate or to correct mismanagement* after being notified that withholding taxes have not been paid satisfies the ... willfulness requirement

(citations and internal quotation marks omitted) (emphasis added); *cf.* Utah Code Ann. § 59–1–302(7)(b)(i)–(iii) (2004).

¶ 17 Given the heritage of the language found in Utah Code section 59–1–302, we believe it appropriate to look to federal case law for guidance with respect to the interpretation and application of the willfulness standards. We note, however, that we do not have the same interpretative freedom enjoyed by the federal courts. While the federal willfulness standards are creatures of federal common law, the willfulness standards we interpret today are statutory. We therefore look to the federal courts for guidance but are mindful of the boundaries placed on us by the plain language of the statutes we interpret.

¶ 18 We now review the court of appeals' application of section 59–1–302, specifically

subsections (7)(b)(ii) ("the reckless disregard standard") and (7)(b)(i) ("the preference standard"). Because Stevenson does not dispute that he was a responsible party under section 5–1–302(2), we focus on whether his conduct constituted "willful[ness]" under that section. But we first consider whether the court of appeals employed the correct standard of review.

## I. THE STANDARD OF REVIEW

¶ 19 We review the decision of the court of appeals, not that of the ALJ. *State v. Topanotes*, 2003 UT 30, ¶ 8, 76 P.3d 1159. We review the court of appeals' decision for correctness and grant no deference to its conclusions of law. *Id.* "One of the components of the court of appeals's decision that we examine for correctness is the standard of review which it applied to the ruling of the [ALJ]." *State v. Brake*, 2004 UT 95, ¶ 11, 103 P.3d 699.

¶ 20 Utah Code section 59–1–610 establishes certain standards of review to be used when appellate courts review adjudicative decisions of the Commission. As required by Utah Code section 59–1–610(1)(a), the court of appeals applied a substantial evidence standard to its review of the ALJ's findings of fact, *see Stevenson v. Tax Comm'n*, 2005 UT App 179, ¶ 10, 112 P.3d 1232, and a correctness standard to the ALJ's conclusions of law, *see* Utah Code Ann. § 59–1–610(1)(b) (2004); *Stevenson*, 2005 UT App 179, ¶ 10, 112 P.3d 1232. Looking to the Tenth Circuit's decision in *Finley v. United States*, 123 F.3d 1342 (10th Cir.1997), the court of appeals characterized the question of willfulness as a mixed question of law and fact. *See Stevenson*, 2005 UT App 179, ¶ 10, 112 P.3d 1232. Section 59–1–610, however, does not establish a standard of review for

---

1.  Utah Code section 59–1–302(2) reads:

    Any person required to collect, truthfully account for, and pay over any tax listed in Subsection (1) who willfully fails to collect the tax, fails to truthfully account for and pay over the tax, or attempts in any manner to evade or defeat any tax or the payment of the tax, shall be liable for a penalty equal to the total amount of the tax evaded, not collected, not accounted for, or not paid over.

    26 U.S.C. § 6672(a) reads:

    Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

such questions. The Commission challenges this characterization and argues that the court erred by not employing the substantial evidence standard in its review of the ALJ's determination of willfulness.

¶ 21 There appears to be no clear consensus among federal courts on how to characterize the question of willfulness. Some courts perceive the question to be one of fact, *see Rykoff v. United States*, 40 F.3d 305, 307 (9th Cir.1994) ("Whether a person has willfully failed to pay over withholding taxes is a question of fact, the determination of which we review for clear error."), while others characterize it as one of law. *See Bradshaw v. United States*, 83 F.3d 1175, 1182 (10th Cir.1995) ("Some circuits have held that the ultimate issue of willfulness is subject to de novo review."); *Hochstein v. United States*, 900 F.2d 543, 547 (2d Cir.1990) ("[W]e believe that the issue ... presents a mixed question of fact and law. Therefore, we will review the district court's [factual] findings ... for clear error, and give plenary review to its conclusion[s]." (citation omitted)). We conclude that the court of appeals was correct in characterizing the question of willfulness as a mixed question of law and fact.

¶ 22 In *State v. Pena*, 869 P.2d 932, 936 (Utah 1994), we explained that a mixed question involves "the application of law to fact or, stated more fully, the determination of whether a given set of facts comes within the reach of a given rule of law." The question of willfulness is certainly fact-dependent, and the ALJ's determinations consequently deserve some measure of deference. But the determination of the question is also shaped by the interpretation and application of law—namely, the different willfulness standards found in Utah Code section 59–1–302(7)(b).

¶ 23 We find persuasive the approach articulated by the Second Circuit in *Hochstein*: "[W]e will review the district court's findings on [the plaintiff's] control over [the company's] finances only for clear error, and give plenary review to its conclusion that this control did not make him [a responsible party] within the meaning of the statute." 900 F.2d at 547. This is consistent with our general treatment of mixed questions: "[A] trial court's factual findings are reviewed deferentially under the clearly erroneous standard, and its conclusions of law are reviewed for correctness with some discretion given to the application of the legal standards to the underlying factual findings." *Brake*, 2004 UT 95, ¶ 12, 103 P.3d 699 (internal quotation marks and brackets omitted); *accord State v. Levin*, 2006 UT 50, ¶¶ 15–31, 144 P.3d 1096.

## II. THE RECKLESS DISREGARD STANDARD

¶ 24 Having established the appropriate standards of review, we now review and affirm the court of appeals' determination that Stevenson's conduct did not constitute "reckless disregard[ ][of] obvious or known risks" of nonpayment. Utah Code Ann. § 59–1–302(7)(b)(ii) (2004).

¶ 25 We first note the type of conduct targeted by section 59–1–302(7)(b)(ii). By its express terms, section 59–1–302(7)(b)(ii) does not provide for strict liability, nor does it trigger liability for mere negligence. *Cf. Denbo v. United States*, 988 F.2d 1029, 1033 (10th Cir.1993) (stating that "negligence does not give rise to ... liability" under the federal willfulness scheme). Instead, the responsible party's conduct must be "reckless[ ]," and the risk of nonpayment must be "obvious" or "known." Utah Code Ann. § 59–1–302(7)(b)(ii) (2004). Authorities have equated reckless disregard with gross negligence. *See Wright v. United States*, 809 F.2d 425, 427 (7th Cir.1987) (holding that "gross negligence is enough to establish reckless disregard"); *Collier on Bankruptcy* § 15.02[3](c)(i) (15th ed.2006) (stating that "[r]esponsible persons are guilty of reckless disregard ... if they are found to be grossly negligent" (internal quotation marks omitted)); *see also* Utah Code Ann. § 76–2–103 (2003) (stating that a person acts recklessly in the criminal law context "when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.").

¶ 26 Applying this lens to the record, we agree with the court of appeals that Stevenson did not recklessly disregard obvious risks of nonpayment. Stevenson was not involved in day-to-day management of Tower or in keeping its books. Stevenson relied on Steckelberg to manage Tower's affairs and visited Tower's office only about once a month. Importantly, Stevenson did not receive actual notice of Steckelberg's mismanagement or Tower's financial problems until November 2000, several months after Tower's noncompliance began. As Tower's treasurer and lone check signatory, Stevenson was, by his own admission, negligent in relying on Steckelberg's assurances of Tower's financial health and in failing to follow up with Steckelberg or Tower's bookkeeper to ensure that taxes were being paid. Such reliance and inaction, however, did not amount to reckless disregard under section 59–1–302(7)(b)(ii).

¶ 27 Courts applying the federal reckless disregard standard have generally found liability only where responsible parties had actual notice of facts evidencing a significant risk of nonpayment, such as a history of nonpayment on the part of the company or a deterioration in the company's financial management.

> The cases holding a responsible person liable ... based on reckless conduct generally fall into one of three distinct fact patterns. First, a responsible person may be held reckless if he relies on someone who is in control of the borrower's finances, *knowing* that this controlling person is unreliable. Second, courts have held that willful conduct also includes failure to investigate or to correct mismanagement, *after having notice* that trust fund taxes were not remitted to the government.... Third, courts have held that a responsible person may ... act willfully by paying other bills, *knowing of* arrearages on payment of ... taxes.

1–7 *Lender Liability Law and Litigation* § 7.03[4][b][i] (2005) (emphasis added).

¶ 28 For example, in *Wright,* the Seventh Circuit affirmed a district court's determination of willfulness where a responsible party knew that the company had a "history of

noncompliance" and that the company's finances were in a "parlous state." 809 F.2d at 428; *see also Kalb v. United States,* 505 F.2d 506, 511 (2d Cir.1974) (stating that reckless disregard "includes failure to investigate or to correct mismanagement *after having notice* that withholding taxes have not been remitted to the Government" (emphasis added)); *Hammon v. United States,* 21 Cl.Ct. 14, 27–29 (1990) (finding liability where a responsible party was "well aware" of the company's past delinquencies, "improperly relied on the same management which historically caused repeated tax difficulties," and "did not institute safeguards to ensure that tax delinquencies would not recur").

¶ 29 We agree with this emphasis on actual notice. If a responsible party learns of facts that indicate a significant risk of noncompliance, he can then ascertain the current state of compliance, review management's actions, install safeguards, and take other steps to ensure compliance. If he fails to take commensurate action, his conduct can then be viewed as recklessness or gross negligence or, in other words, "a gross deviation from the standard of care that an ordinary person would exercise" in the given circumstances. Utah Code Ann. § 76–2–103 (2003).

¶ 30 Absent actual notice, courts have generally been reluctant to impose liability where a responsible party "should have known that taxes owed were not paid." *Kalb,* 505 F.2d at 511. This makes sense: inaction where one "should have known" of significant risks of nonpayment is less egregious—i.e., a smaller "deviation from the standard of care that an ordinary person would exercise," Utah Code Ann. § 76–2–103 (2003), than inaction where one actually knows of facts that signal significant risks of nonpayment. We therefore conclude that absent actual notice of such facts, Stevenson's failure to "inquire about the status of the taxes ... [did] not equal reckless disregard." *In re Macagnone,* 253 B.R. 99, 102 (M.D.Fla.2000).

## III. THE PREFERENCE STANDARD

¶ 31 We next consider the court of appeals' application of the preference stan-

dard found in Utah Code section 59–1–302(7)(b)(i). We first set forth an interpretation of the term "prefer." We then vacate the court of appeals' order to remand, and we conclude that because the Bank's interest in the Account Receivable was superior to the interest of the state, Stevenson did not prefer the Bank over the state. Finally, we affirm the court of appeals' conclusion that Stevenson did not act willfully under section 59–1–302(7)(b)(i) by using the Personal Funds to purchase the Subcontractors' claims.

¶ 32 Our task first requires us to engage in statutory construction. When we interpret a statute, our "primary goal . . . is to give effect to the legislative intent, as evidenced by the plain language, in light of the purpose the ·statute was meant to achieve." *State v. Holm*, 2006 UT 31, ¶ 16, 137 P.3d 726 (internal quotation marks omitted). We "look first to the plain language of a statute to determine its meaning," *MacFarlane v. State Tax Comm'n*, 2006 UT 25, ¶ 12, 134 P.3d 1116 (internal quotation marks omitted), "and interpret its provisions in harmony with other statutes in the same chapter and related chapters," *Holm*, 2006 UT 31, ¶ 16, 137 P.3d 726 (internal quotation marks omitted). "Only when we find that a statute is ambiguous do we look to other interpretive tools." *Id.*

¶ 33 We therefore begin with the plain language of Utah Code section 59–1–302(7)(b)(i). This section renders Stevenson liable for Tower's delinquent withholding taxes if he "[1] made a voluntary, conscious, and intentional decision, [2] to prefer other creditors over the state government or [3] utilize the tax money for personal purposes." Utah Code Ann. § 59–1–302(7)(b)(i) (2003). Because the Commission has not alleged that Stevenson used the Account Receivable for personal purposes, the third part of the statute is unimportant for our analytical purposes. Similarly, Stevenson concedes that he made a "voluntary, conscious, and intentional decision" to transfer the Account Receivable to the Bank, and that he had actual notice of Tower's tax delinquency at the time of the transfer. *See Ghandour v. United States*, 36 Fed.Cl. 53, 62 (1996) (interpreting "voluntary

and intentional" as requiring the responsible party to have had "actual knowledge" of the tax delinquency at the time of the transfer). As a result, we focus on the second part of the statute—in particular, its critical verb: "to *prefer* other creditors over the state government." Utah Code Ann. § 59–1–302(7)(b)(i) (2003) (emphasis added).

¶ 34 According to *Black's Law Dictionary* 1197 (7th ed.1999), the term "prefer" means "[t]o give priority to, such as to one creditor over another." Consistent with usage of the term in federal bankruptcy law, *see* 11 U.S.C. § 547(b) (2000), we have explained that transfers to creditors are "preferential when the effect of the transfer may enable the creditor to obtain a greater percentage of his debt than another creditor of the same class would receive," *Wilcox v. CSX Corp.*, 2003 UT 21, ¶ 26, 70 P.3d 85 (internal quotation marks and brackets omitted). We therefore interpret the term "prefer" as the act·of making a "transfer [that] enable[s] the creditor to obtain a greater percentage of his debt than another creditor of the same class would receive." *Id.* (internal quotation marks omitted). Therefore, under section 59–1–302(7)(b)(i), a responsible party does not prefer a creditor over the state government when he makes a transfer to a creditor whose interest is superior to that of the state.

¶ 35 We acknowledge that some federal circuit courts of appeals have adopted the two-part test articulated in *Honey v. United States*, 963 F.2d 1083, 1090 (8th Cir.1992), which expands the preference analysis. *See Bell v. United States*, 355 F.3d 387, 395 (6th Cir.2004) (adopting *Honey* test); *United States v. Kim*, 111 F.3d 1351, 1359 (7th Cir. 1997) (same); *Barnett v. IRS*, 988 F.2d 1449, 1458 (5th Cir.1993) (same). Under the *Honey* test, courts evaluate the creditor's interest to determine whether it was superior to the government's interest and whether it "would have prevented the use of the funds . . . for the payment of the tax obligations." 963 F.2d at 1091. Courts will find a preference if the creditor's interest fails either prong of the test. *See id.*

¶ 36 We decline to adopt the *Honey* test, as it requires an analysis of factors not in-

cluded in the plain language of section 59–1–302(7)(b)(i). Indeed, the *Honey* test seems to be a product of the fact that the federal willfulness standards are creatures of the common law. The federal courts therefore possess unfettered freedom to interpret and expand on their own precedent. We, however, are constrained by the boundaries set by the plain language of our legislature's directives. If the legislature wishes to follow the *Honey* model, it may evidence that intent by amending section 59–1–302 accordingly. With these principles in mind, we turn our attention to the Account Receivable.

### A. The Account Receivable

¶ 37 We now determine whether the perfected security interest held by the Bank in the Account Receivable was superior to the state's interest in those same funds. To evaluate the nature of the state's interest in the Account Receivable, we review Utah Code sections 59–10–406(6) and 59–1–302.1, which govern the creation and priority of tax liens.

¶ 38 According to Utah Code 59–10–406(6)(c), withholding tax liens have superpriority: they *"shall be prior to any lien of any kind,* including existing liens for taxes"* (emphasis added). Withholding tax liens therefore have priority over all competing security interests, including the type asserted by the Bank in the Account Receivable. We have previously upheld the validity of such liens, stating that the "Legislature has the undoubted right and power to make taxes a lien upon all the property of the owner of the taxed property, and also to give such lien priority over all other liens of whatsoever nature." *Union Cent. Life Ins. Co. v. Black,* 67 Utah 268, 247 P. 486, 487 (1926); *see also A.C. Fin. v. Salt Lake County,* 948 P.2d 771, 773 (Utah 1997) (reaffirming *Black* and explaining that "as a general principle of law . . . the Legislature has power to make its tax liens prior to any other lien"). We do, however, construe tax lien statutes "strictly so that liens are not expanded by implication." *A.C. Fin.,* 948 P.2d at 779.

¶ 39 Section 59–10–406(6)(b) states that "the state shall have" a superpriority lien "so long as any delinquency continues." At first glance, this language seems to indicate that the lien springs into existence the moment the taxpayer's delinquency begins. This section, however, must be read in conjunction with section 59–1–302.1, which states that "[i]f any person liable to pay any tax provided in Title 59 . . . neglects or refuses to pay that tax after demand, *the amount . . . is a lien in favor of the state . . . .* Unless another date is specifically fixed by law, *the lien imposed by this section for unpaid taxes arises at the time the assessment is made"* (emphasis added). Section 59–1–302.1 thus clarifies that the state's superpriority lien for delinquent withholding taxes actually arises at the time of assessment.

¶ 40 Our decision in *State v. I.M.C. Mint Corp.,* 610 P.2d 1265, 1267 (Utah 1980), lends support to this interpretation of these two statutes. In that decision, we followed *Phillips Petroleum Co. v. Wagstaff,* 22 Utah 2d 177, 450 P.2d 100, 102 (1969), in which we held that "the lien of a state for delinquent withholding taxes begins to run at the time notice thereof is given by filing the warrant." [2] *I.M.C. Mint,* 610 P.2d at 1266. We

---

**2.** In *Phillips,* we interpreted section 59–14–71(3)(e), the language of which was substantially the same as section 59–10–406(6). Section 59–14–71(3)(e) then read:

Every employer who deducts and withholds any amounts under the provisions of this act shall hold the same in trust for the state of Utah for the payment thereof to the commission in the manner and at the time provided for in this act and *the state of Utah shall have a lien* to secure the payment of any amounts withheld and not remitted as provided herein upon all of the assets of the employer and all property, including stock in trade, business fixtures and equipment, owned or used by the

employer in the conduct of his business, *so long as any delinquency continues, which said lien shall be prior to any lien* of any kind whatsoever including existing liens for taxes. Utah Code Ann. § 59–14–71(3)(e) (1963) (emphasis added). Section 59–10–406(6) now reads:

(a) Each employer that deducts and withholds any amount under this part shall hold the amount in trust for the state for the payment of the amount to the commission in the manner and at the time provided for in this part.

(b) *So long as any delinquency continues, the state shall have a lien* to secure the payment of any amounts withheld, and not remitted as provided under this section, upon all of the

noted in *I.M.C. Mint*, however, that the warrant requirement had been superseded by amendments to section 59–10–22 (1979), the predecessor to sections 59–1–302 and 59–1–302.1.[3] *Id.* at 1267. And we noted that under the amended statutes (which did not control in *I.M.C. Mint*), "lien priority of tax debts is now established by statute to date from the time a tax assessment is made." *Id.* Thus, our reading of sections 59–1–302 and 59–1–302.1 is consistent with our holding in *I.M.C. Mint*, as well as our policy of construing tax lien statutes "strictly so that liens are not expanded by implication." *A.C. Fin.*, 948 P.2d at 779. If the legislature intends for these superpriority liens to arise automatically at the moment delinquency begins, it can amend the language of sections 59–1–302 and 59–1–302.1 to reflect this intent.

¶ 41 The record does not reveal that the Commission made any assessment against either Tower or Stevenson before the payment of the Account Receivable to the Bank. And counsel for the Commission affirmed at oral argument that no assessment was made prior to the personal assessment made against Stevenson in July 2002. As a result, we conclude that the state's tax lien had not arisen at the time Stevenson arranged for the Bank's receipt of the Account Receivable. Because the Bank's security interest in the Account Receivable was superior to the interest of the state, we hold that Stevenson did not make a "voluntary, conscious, and intentional decision to prefer" the Bank over the state. Utah Code Ann. § 59–1–302(7)(b)(i) (2004). We accordingly vacate the court of appeals' order to remand this issue for further consideration.

## B. The Personal Funds

¶ 42 We finally turn to the court of appeals' determination that Stevenson's use of the Personal Funds to purchase the Subcontractors' claims did not constitute willfulness under section 59–1–302(7)(b)(i). The Commission contends that the Personal Funds were unencumbered corporate funds that were available to pay Tower's tax obligation. We disagree.

¶ 43 In support of its argument, the Commission points to the Ninth Circuit's decision in *Sorenson v. United States*, 521 F.2d 325 (9th Cir.1975). In that case, a business owner used personal funds to pay his employees' net wages. *Id.* at 327. The court held that the "personal funds became funds of the corporation" because they were used to pay "corporate obligations." *Id.* (internal quotation marks omitted). The court reasoned that by using these funds to pay wages rather than the company's withholding tax obligation, the owner "prefer[red] creditors hold-

assets of the employer and all property owned or used by the employer in the conduct of the employer's business, including stock-in-trade, business fixtures, and equipment.

(c) *The lien described in Subsection (6)(b) shall be prior to any lien of any kind,* including existing liens for taxes.

Utah Code Ann. § 59–10–406(6) (Supp.2006) (emphasis added).

**3.** The 1979 version of section 59–10–22 read:

(2) If any person liable to pay the Utah sales and *withholding tax* neglects or refuses to pay the same after demand, the amount, including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto, *shall be a lien* in favor of the State of Utah upon all property and rights to property, whether real or personal, belonging to such person.

(3) Unless another date is specifically fixed by law, *the lien imposed for state taxes shall arise at the time the assessment is made* and shall continue until the liability for the amount so assessed (or a judgment against the taxpay-

er arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time.

Utah Code Ann. § 59–10–22 (Supp.1981) (emphasis added). Section 59–1–302.1 now reads:

(1) If any person liable to pay *any tax provided in Title 59,* except a tax imposed under Chapter 2, 3, or 4, neglects or refuses to pay that tax after demand, the amount, including any interest, additional amount, additional tax, or assessable penalty, together with any costs that may accrue, *is a lien* in favor of the state upon all property and rights to property, whether real or personal, belonging to that person.

(2) Unless another date is specifically fixed by law, *the lien imposed by this section for unpaid taxes arises at the time the assessment is made* and continues until the liability for the assessed amount, or a judgment against the taxpayer arising from that liability, is satisfied or becomes unenforceable because of lapse of time.

Utah Code Ann. § 59–1–302.1 (2004) (emphasis added).

ing wage claims over tax claims held by the [government]." *Id.* at 328.

¶ 44 *Sorenson* is distinguishable. In this case, Stevenson used the Personal Funds to *purchase* the Subcontractors' claims against Tower; he did not *satisfy* them. Stevenson's use of the Personal Funds did not satisfy or extinguish any "corporate obligations"— those obligations remain unpaid. *Id.* at 327. Because Stevenson's use of the Personal Funds did not result in any payment of "corporate obligations," the Personal Funds never "became funds of the corporation." *Id.* As a result, the Personal Funds were never available to pay Tower's tax obligations. We therefore affirm the court of appeals' conclusion that Stevenson's use of the Personal Funds did not constitute a willful failure to pay withholding taxes.

## CONCLUSION

¶ 45 We affirm the court of appeals' determination that Stevenson did not recklessly disregard any obvious risks of nonpayment, as well as its determination that Stevenson did not act willfully with respect to the Personal Funds. But we disagree with the court of appeals' conclusion that the matter should be remanded to allow the Commission to present further evidence on the preference issue. Instead, we hold that Stevenson did not make a voluntary decision to prefer the Bank over the state. Because Stevenson is not liable for the withholding taxes under any of the theories advanced by the Commission, we reverse the court of appeals' order to remand the matter for redetermination by the ALJ.

¶ 46 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice NEHRING concur in Justice PARRISH's opinion.