2009 UT 36

**ABCO ENTERPRISES, Petitioner,**

v.

**UTAH STATE TAX COMMISSION; Board of Equalization of Weber County, State of Utah, Respondents.**

No. 20070429.

Supreme Court of Utah.

June 12, 2009.

Rehearing Denied June 12, 2009.

ties were exempt from property tax under the Utah Constitution. In spite of the exempt nature of the properties, the Weber County Board of Equalization (Weber County) assessed a privilege tax against ABCO pursuant to Utah Code section 59–4–101. Under the statute, because ABCO used the properties to conduct a for-profit business ABCO must pay a privilege tax in the same amount as the property taxes that would have been owed by an owner of nonexempt property. Both Weber County and the Utah State Tax Commission (the Commission) ruled that Weber County properly assessed the privilege tax. ABCO now asks us to determine whether section 59–4–101, by assessing a privilege tax on a leasehold interest at the same amount that a fee simple interest would be assessed, violates the uniform operation of laws provision of article I, section 24 of the Utah Constitution or the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. We hold that section 59–4–101 does not violate Utah's uniform operation of laws provision, and therefore does not violate the Equal Protection Clause. Accordingly, we affirm the decision of the Commission.

Randall K. Spencer, Provo, for petitioner.

Mark L. Shurtleff, Att'y Gen., Bradley C. Johnson, Asst. Att'y Gen., Salt Lake City, for Tax Commission.

Monette Hurtado, Ogden, for Board of Equalization.

## AMENDED OPINION *

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 As part of a land exchange agreement with Ogden City, ABCO Enterprises (ABCO) occupied and used for several years two parcels of property owned by Ogden City. Because of Ogden City's ownership, the proper-

## BACKGROUND[1]

¶ 2 In 1997, ABCO entered into an agreement with Ogden City to exchange two parcels of its property for two parcels owned by Ogden City. The two parcels owned by Ogden City included existing buildings and are numbered parcel number 30–300–7173 with Building 6D, and parcel number 30–300–7089 with Building 9A (hereafter the land and all the improvements will be referred to as Building 6D and Building 9A respectively). Building 9A and Building 6D are located in the Business Depot, a former military base which Ogden City purchased and redeveloped as a business park in the mid-nineties. Since the federal government needed to complete the environmental and

---

* The Court has rewritten paragraph number 7.

1. On appeal from an order of an administrative agency, the appealing party, in this case ABCO, "bears the burden of demonstrating that the agency's factual determinations are not supported by substantial evidence ... [and] we state the facts and all legitimate inferences drawn therefrom in the light most favorable to the agency's findings." *Zissi v. State Tax Comm'n,* 842 P.2d 848, 852 (Utah 1992) (citing Utah Code Ann. § 63–46b–16(4)(g) (current version at Utah Code Ann. § 63G–4–403(4)(g) (2008))).

title work before title could transfer to ABCO, ABCO entered into a property exchange agreement with Ogden City. Under the agreement, Ogden City would retain title to its properties until the environmental studies and title work were finished and ABCO would occupy and use the properties. ABCO occupied the buildings and used the properties during all periods at issue in this case.

¶ 3 In 2005, Weber County assessed a privilege tax on Building 6D for the tax years 1999 through 2005, and on Building 9A for the tax years 2002 through 2005. Since Ogden City still held title to the properties, it was exempt from taxation pursuant to the Utah Constitution. *See* Utah Const. art. XIII, § 3(1) (exempting property owned by the State or by a political subdivision of the State from property taxes). ABCO was nonetheless subject to a privilege or use tax pursuant to Utah Code section 59–4–101 based on its for-profit business use of the exempt property. Under the statute, the privilege tax is "imposed under this chapter [in] ... the same amount that the ... tax would be if the possessor or user were the owner of the property." Utah Code Ann. § 59–4–101(2) (2006). Consequently, as here, if the property is owned by a tax-exempt entity but it is leased to another entity in connection with a for-profit business, then the lessee is liable for the privilege tax in the same amount as the owner would be if the owner were using the property in connection with a for-profit business.

¶ 4 On November 11, 2005, ABCO filed a Request for Redetermination with Weber County for its decision to levy the privilege tax at the fee simple value as directed by the statute. In the request, ABCO objected to Weber County's valuation of the properties because Weber County did not take into account the fact that the properties were leased rather than owned. Weber County reviewed the request and made a determination that the taxable value was unchanged for the purposes of the statute; it did not address the issue of the potential difference in value between a title and leasehold interest in the properties. ABCO appealed this de-

termination to the Commission, which held a formal hearing.

¶ 5 In the Order resulting from the formal hearing, the Commission adjusted the valuation of the property to reflect ABCO's evidence for a lower appraisal. The Commission, however, rejected the lowest appraisal offered, which was calculated solely on the leasehold nature of ABCO's interest in the properties. The Commission found that the statute under which the tax was levied made no distinction between leasehold and fee simple values and that the Commission lacked the authority to evaluate whether the statute was unconstitutional.

¶ 6 ABCO petitioned this court to review the Commission's decision. We have jurisdiction over this matter pursuant to Utah Code section 78A–3–102(3)(e)(ii) (2008). The appeal presents two issues: (1) whether Utah Code section 59–4–101 is unconstitutional under article I, section 24 of the Utah Constitution because it classifies potentially differently situated persons in a similar manner, and (2) whether Utah Code section 59–4–101 is unconstitutional under the Equal Protection Clause of the United States Constitution for the same reason.

## STANDARD OF REVIEW

¶ 7 In reviewing a formal adjudicative proceeding of the Utah State Tax Commission, we look to Utah Code section 59–1–610. *See State Tax Comm'n v. Stevenson,* 2006 UT 84, ¶ 20, 150 P.3d 521. We grant deference to the Commission's "findings of fact, applying a substantial evidence standard on review." Utah Code Ann. § 59–1–610(1)(a) (2008). We review the Commission's conclusions of law for correctness, granting no deference where the statute at issue, as here, gives no explicit grant of discretion to the Commission. *Id.* § 59–1–610(1)(b). Also, "[a] matter 'of statutory interpretation [is] a question of law that we review on appeal for correctness.'" *MacFarlane v. State Tax Comm'n,* 2006 UT 25, ¶ 9, 134 P.3d 1116 (second alteration in original) (quoting *State v. Schofield,* 2002 UT 132, ¶ 6, 63 P.3d 667).

## ANALYSIS

### I. THE PRESERVATION RULE DOES NOT BAR ABCO'S STATE CONSTITUTIONAL CLAIM

¶ 8 Before proceeding to ABCO's state and federal constitutional challenges, we address Weber County's contention that ABCO waived its state constitutional claims because it only raised federal equal protection claims below. We hold that where, as here, the sole issue on appeal is a facial constitutional challenge to a tax statute, we may address that challenge on appeal even if it has not been explicitly raised before the administrative agency.

¶ 9 Generally, the preservation rule applies in three different situations, none of which are present in this case. First, where an appeal is made from a trial court, an issue must be preserved below "to give the trial court an opportunity to address the claimed error," and to "prevent[ ] a party from avoiding an issue at trial for strategic reasons only to raise the issue on appeal if the strategy fails." *Tschaggeny v. Milbank Ins. Co.*, 2007 UT 37, ¶ 20, 163 P.3d 615 (quoting *State v. Cram*, 2002 UT 37, ¶ 10, 46 P.3d 230) (internal quotation marks omitted).

¶ 10 Second, the preservation rule applies to appeals from administrative agencies when mandated by statute. *See* Utah Code Ann. § 54–7–15(2)(b) (Supp.2008) (stating in statutory section regarding judicial review of Public Service Commission decisions that "[a]n applicant may not urge or rely on any ground not set forth in the application in an appeal to any court"); *Ball v. Pub. Serv. Comm'n*, 2007 UT 79, ¶ 42, 175 P.3d 545 (ruling that judicial review of issues of agency error were waived where issues were not preserved in request for agency reconsideration as dictated by statute); *Westside Dixon Assoc., L.L.C. v. Utah Power & Light Co.*, 2002 UT 31, ¶ 22, 44 P.3d 775 (concluding that failure to raise claims on petition before the Public Service Commission constituted waiver on appeal).

¶ 11 Third, as we explained in *Nebeker v. State Tax Commission*, when not mandated by statute, the preservation rule applies when the issue raised on appeal could have been resolved in the administrative setting, or would have allowed the agency to "obviate the need to address the constitutional" issue. 2001 UT 74, ¶ 20 n. 4, 34 P.3d 180 (holding constitutional claims waived when "there are also non-constitutional claims that can be resolved before the Tax Commission that may obviate the need to address the constitutional question"). The rationale behind this rule permits courts to avoid "procedural confusion and piecemeal litigation." *Id.* ¶ 19. We also noted in *Nebeker* that raising the constitutional issue in the administrative proceeding might have put the Commission on notice of potential constitutional challenges and allowed it to rethink its administrative rules. *Id.* ¶ 20.

¶ 12 This case does not present any of the situations where preservation is required. ABCO raised an equal protection challenge to the statute below, albeit solely with reference to the federal constitution. Applying the preservation rule to bar the substantially equivalent state constitutional claim would not serve any of the purposes cited in *Nebeker*. First, the overall facial constitutional challenge could not have been avoided by raising the state constitutional claim along with the federal claim. Second, no "piecemeal litigation" has resulted from the expansion of the claim. Third, raising the state constitutional claim in the administrative proceeding would not have served any useful purpose related to notice because the Commission had no authority to address any of the constitutional claims. As this is not an appeal from a trial court, the preservation rule is not mandated by statute, and the presentation of the issue in the administrative proceeding would not have served any useful purpose, ABCO's state constitutional claim is not waived. Accordingly, we now address ABCO's constitutional challenges.

### II. THE UNIFORM OPERATION OF LAWS PROVISION PROTECTS PERSONS FROM DISCRIMINATION AT LEAST AS MUCH AS THE EQUAL PROTECTION CLAUSE

¶ 13 ABCO argues that the privilege tax imposed by Utah Code section 59–4–101 is unconstitutional under the uniform operation of laws provision of the Utah Constitution

and under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because the statute impermissibly treats differently situated parties in the same manner by applying the same tax to lessees of exempt property as to owners.

¶ 14 Despite differing language, the uniform operation of laws provision affords protection similar to that of the Equal Protection Clause. Article I, section 24 of the Utah Constitution states: "All laws of a general nature shall have uniform operation." Utah Const. art. I, § 24. The Fourteenth Amendment to the United States Constitution prohibits states from enacting laws that "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Both the uniform operation of laws provision and the Equal Protection Clause " 'embody the same general principle: persons similarly situated should be treated similarly, and persons in different circumstances should not be treated as if their circumstances were the same.' " *Gallivan v. Walker*, 2002 UT 89, ¶ 31, 54 P.3d 1069 (quoting *Malan v. Lewis*, 693 P.2d 661, 669 (Utah 1984)); *see also State v. Merrill*, 2005 UT 34, ¶ 31, 114 P.3d 585 (stating that the state and federal constitutional provisions are "substantially parallel"); *Wood v. Univ. of Utah Med. Ctr.*, 2002 UT 134, ¶ 32, 67 P.3d 436 (stating that the uniform operation of laws provision "is, in fact, the Utah equal protection guarantee"); *Lee v. Gaufin*, 867 P.2d 572, 577 (Utah 1993) (stating that though the language and history of the two provisions are different, "there are important areas of overlap in the concepts embodied in the two provisions"). Since "our analysis under the uniform operation of laws provision is at least as rigorous as it would be under the federal equal protection provision," we accordingly limit our review to ABCO's state constitutional claim. *Merrill*, 2005 UT 34, ¶ 31, 114 P.3d 585.

## III. UNDER OUR THREE–PART INQUIRY, THE PRIVILEGE TAX STATUTE COMPLIES WITH THE UNIFORM OPERATION OF LAWS PROVISION OF THE UTAH CONSTITUTION

¶ 15 In analyzing a legislative enactment under article I, section 24, we must make three determinations: (1) whether the classification is reasonable; (2) whether the objective of the legislative action is legitimate; and (3) whether there is a reasonable relationship between the legislative purpose and the classification. *Blue Cross & Blue Shield of Utah v. State*, 779 P.2d 634, 637 (Utah 1989); *see also Anderson v. Provo City Corp.*, 2005 UT 5, ¶ 18, 108 P.3d 701; *Gallivan v. Walker*, 2002 UT 89, ¶ 43, 54 P.3d 1069. While the analytical model used to determine if the uniform laws provision is met is the same in all inquiries, we give broad deference to legislative enactments in the area of taxes and purely economic regulation. *Blue Cross & Blue Shield*, 779 P.2d at 637; *Mountain Fuel Supply Co. v. Salt Lake City Corp.*, 752 P.2d 884, 888 (Utah 1988). Further, we strongly presume tax statutes are constitutional. *Kennecott Corp. v. State Tax Comm'n*, 858 P.2d 1381, 1384 (Utah 1993).

¶ 16 ABCO argues that it is unreasonable to include lessees of exempt property in the same class as fee simple owners for the purposes of the privilege tax, and thus the uniform operation of laws provision is violated by the legislature's failure to treat lessees as a differently situated class. We are not persuaded. Utah Code section 59–4–101, which includes lessees of exempt property in the same class as fee simple owners of exempt property, is not unreasonable or arbitrary, nor does it lack a reasonable relationship to the purpose of the taxing scheme.

### A. The Privilege Tax Statute Creates a Reasonable Classification

¶ 17 Broad deference is given to the legislature when assessing "the reasonableness of its classifications and their relationship to legitimate legislative purposes." *Blue Cross & Blue Shield*, 779 P.2d at 637. But classifications and their relationship to legislative purposes must be reasonable and not arbitrary. *State v. Merrill*, 2005 UT 34, ¶ 34, 114 P.3d 585. To determine whether an "imperfect classification" is an impermissible classification, we "examin[e] . . . the impact

of the misclassification." *See Blue Cross & Blue Shield*, 779 P.2d at 643 (noting that examination of the impact of a classification is not constitutionally required, but "can be relevant to determining whether the legislative body has exceeded the bounds of its broad discretion" by creating the classification at issue). Among the factors we have used to evaluate a possibly overinclusive tax-related classification, three are relevant here: (1) the choice made by the potentially distinct class to voluntarily join the classification, (2) the extent of the competitive disadvantage caused by the classification, and (3) the effectiveness of the tax in accomplishing the taxing entity's aims. *See Amax Magnesium Corp. v. State Tax Comm'n*, 796 P.2d 1256, 1261–62 (Utah 1990); *Blue Cross & Blue Shield*, 779 P.2d at 644–45; *Mountain Fuel Supply*, 752 P.2d at 891.

### 1. ABCO Voluntarily Joined the Classification

¶ 18 A classification may be unreasonable if fundamentally different groups are compelled to be treated similarly under an overinclusive classification. In *Lee*, we found that the legislature had created an unreasonable and arbitrary classification under the statute of limitations provision of the Medical Malpractice Act because it "treat[ed] minors and adults as if they were situated the same under the law." 867 P.2d at 578. The "targets" of the classification "could do nothing to escape their fate. They did not join their statutory classification by choice. They were not volunteers." *Merrill*, 2005 UT 34, ¶ 38, 114 P.3d 585 (discussing *Lee*, 867 P.2d at 577). Some of the rationales for finding the classification unreasonable were the historically different rules "necessary to protect the legal rights of children," and the "fundamental differences between minors and adults with respect to their status in the law." *Lee*, 867 P.2d at 578–79.

¶ 19 In this case, such fundamental differences do not exist where lessees and fee simple owners are classified similarly for purposes of achieving the goals of a tax statute. Lessees can decline to be so classified by leasing nonexempt property rather than exempt property. In contrast to the minors in *Lee*, ABCO is a volunteer and could have escaped its fate merely by declining to enter into the property exchange agreement with Ogden City.

### 2. The Privilege Tax Does Not Create a Competitive Disadvantage

¶ 20 ABCO does not suffer from a substantial competitive disadvantage from the classification. In *Mountain Fuel Supply*, we concluded that a potentially underinclusive taxing scheme at issue did not create a competitive disadvantage for the taxed entity and effectively accomplished the aims of the taxing body. 752 P.2d at 891. There, Mountain Fuel Supply was able to pass on the tax in question to its customers without a large administrative burden and its customers continued to overwhelmingly choose natural gas and electricity over other heating fuel possibilities regardless of a tax added solely to natural gas and electricity. *Id.*

¶ 21 Here, ABCO argues that as a lessee it cannot use equity value in the property to repair the roofs of the buildings, and therefore it is unable to obtain the highest use of the buildings. We fail to see how this is unlike the differences between lessees and fee simple owners of nonexempt property, where such factors as who must pay taxes and maintain buildings are part of the negotiation of the terms of a lease. That ABCO failed to protect itself in its negotiations of maintenance provisions or tax burdens in its short-term property exchange agreement with Ogden City does not result in a substantial impact or a competitive disadvantage created by the statute. Presumably, other lessees of nonexempt property who failed to negotiate such provisions, or even fee simple owners who were unable to leverage the property for various reasons, would be in the same position as ABCO, regardless of the statute. Therefore, the statutory classification is reasonable.

### 3. The Classification Effectively Achieves the Aims of Weber County

¶ 22 We have found that a classification reasonably achieves the aims of a taxing entity where it would be too administratively burdensome to collect the tax by creating

different classifications or where the classification is a reasonable means to equalize the tax burden generally. *See Mountain Fuel Supply,* 752 P.2d at 891 (holding that a potentially underinclusive tax classification was reasonable because it would be too large an administrative burden to collect such a tax from "small-scale fuel suppliers"); *Amax Magnesium Corp.,* 796 P.2d at 1261–62 (finding that the tax scheme was not an effective method to accomplish the aim of equalizing the tax burden among state and county assessments because the valuation method actually aggravated the disparity between tax burdens rather than equalizing it). In the end, "we do not require perfection" in the area of purely economic regulation and recognize that "[l]egislative enactments that are basically economic in nature rarely affect all persons equally." *Blue Cross & Blue Shield,* 779 P.2d at 644 (citation omitted).

▉ ¶ 23 Here, the statute serves to equalize the tax burden. Its objective is to "close any gaps in the tax laws" between those who possess or use *exempt* property for a profit and those who possess or use *nonexempt* property for a profit. *Great Salt Lake Minerals & Chem. Corp. v. State Tax Comm'n,* 573 P.2d 337, 339 (Utah 1977). The privilege tax—regardless of whether the taxee is the possessor or lessee of the tax-exempt property used for profit—effectively achieves this purpose with less administrative burden. The privilege tax ensures that exempt property used in connection with a for-profit business is taxed at an equal rate to the same business conducted on nonexempt property.

### B. The Legislative Purpose of the Privilege Tax Statute Is Legitimate

¶ 24 Even if some distinctions could be made among groups within a classification, under the second step we may still affirm the validity of the statute where "on the whole, after considering the burdens it imposed on those taxed, it appear[s] to be a reasonable attempt to achieve the legitimate government ends." *Blue Cross & Blue Shield,* 779 P.2d at 644 (discussing this court's affirmation of a classification scheme in *Mountain Fuel Sup-*

*ply* that may "[a]t the margins ... not have stood the test of its justifications").

¶ 25 The legislative objective of section 59–4–101 is to close any gaps in the tax laws. This objective was discussed at length and validated in *Thiokol Chemical Corp. v. Peterson:*

> It is evident that the 1959 Legislature, by the enactment of Section 59–13–73, [later renumbered as section 59–4–101,] *intended to close any gaps in the tax laws* by imposing a tax on any property possessed or used in connection with a business for profit which was otherwise exempt from taxation. It closely resembles the Michigan statute of similar purpose, which was recently held constitutional in a series of U.S. Supreme Court cases. They are grounded on the proposition that a private contractor's right to use property in a business for profit may be made subject to a nondiscriminatory tax based on its value, even though title to the property may be in the United States; and that the burden of the tax may ultimately fall on it.

15 Utah 2d 355, 393 P.2d 391, 393–94 (1964) (footnotes omitted) (emphasis added). In *Mountain Fuel Supply,* we upheld the legitimacy of a similar statute, which raised revenue and equalized the tax burden in a more fair and uniform manner. 752 P.2d at 890. ABCO contends that under our reasoning in *Beaver County v. WilTel, Inc.,* 2000 UT 29, ¶ 34, 995 P.2d 602, the legitimacy of the legislative purpose to "close any gaps in the tax law" is discounted. But that reliance is misplaced. In *WilTel,* we held that there was "no 'gap' to close" because the intangible property at issue was subject to an entirely different tax scheme and thus had "not escaped taxation." *Id.*

¶ 26 ABCO's position would lead to a gap in the tax scheme because ABCO is actually petitioning to be taxed for a lesser amount. This lesser amount would create a gap in the tax scheme by allowing lessees who use exempt property in connection with a for-profit business to pay less tax than an owner of nonexempt property. The full value of the exempt property would thus escape taxation. Consequently, the gap would establish an incentive for an owner of exempt property to

lease the property, and thus lower tax liability and for businesses to rent from exempt over nonexempt property owners. Indeed, such a gap would create a potential competitive disadvantage for businesses that lease from private property owners. These are the sort of gaps that the legislature sought to avoid. Thus, the legislative purpose for the statute is legitimate.

### C. A Rational Relationship Exists Between the Legislative Purpose and the Classification

¶ 27 The legislative purpose of the statute is "to close any gaps in the tax laws by imposing a tax on any property possessed or used in connection with a business for profit which was otherwise exempt from taxation." *Thiokol Chem. Corp.*, 393 P.2d at 393. This allows Weber County to raise revenue for governmental expenses, which we have held is a legitimate governmental purpose. *Blue Cross & Blue Shield*, 779 P.2d at 640. Further, so long as there is no "unreasonable burden on the affected parties," Weber County "is not to be denied the ... effective means of raising ... revenue[ ]." *Mountain Fuel Supply*, 752 P.2d at 891.

¶ 28 Here, it is not unreasonable to impose the pro rata share of raising governmental revenue upon a lessee of exempt property, especially where the property would otherwise escape taxation. As discussed above, such taxes are able to be negotiated between a lessee and owner and do not impose a substantial competitive burden upon a lessee of exempt property as opposed to a lessee of nonexempt property. Therefore, the means used to achieve the legitimate governmental purpose are reasonable.

### CONCLUSION

¶ 29 The privilege tax of Utah Code section 59–4–101 does not violate the uniform operation of laws provision of the Utah Constitution or the Equal Protection Clause. Our three-part inquiry shows that the privilege tax meets the uniform operation of laws provision. First, the classification created by the privilege tax is reasonable, where ABCO voluntarily joined the classification, the privilege tax creates no competitive disadvantage, and the privilege tax equalizes the tax burden. Second, the legislative purpose of the privilege tax is legitimate in that the privilege tax closes any gaps in the tax law. Third, the classification is rationally related to the legitimate purpose where no unreasonable burden exists and the privilege tax effectively closes any gaps through equalized revenue generation. Accordingly, we affirm the decision of the Commission.

¶ 30 Associate Chief Justice DURRANT, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.